Good morning, Your Honors. Renee Maness of the Federal Public Defenders here on behalf of the appellant, Mr. George Karadimos. This is a Federal criminal action. The underlying charge is copyright infringement. The charge in the indictment is that in 2004, Mr. Karadimos sold an item which was subject to copyright infringement in a value of $2,500. Mr. Karadimos pled guilty to that charge without a plea agreement and making no other admissions. At the time of sentencing, the primary contested issue was the valuation of the loss for Mr. Karadimos's conduct. The only loss which he admitted was the $2,500 figure. He contested any other loss, and, of course, under this Court's decision in United States v. Ameline, that gave the government the burden of presenting evidence to substantiate the loss figure that they were seeking in order to establish the appropriate guideline range for sentencing purposes. Because the government was seeking a fairly extraordinarily high loss valuation, their burden was clear and convincing evidence. In the original pre-sentence report, a suggested loss valuation of $975,000 was the only loss which Mr. Karadimos was estimated. Mr. Karadimos and I specifically objected to this figure, noting that it was purely speculative. There had been a recent decision of the Ninth Circuit at that time, United States v. Kennedy, that noted that loss valuations could not be based upon speculative evidence. In the government's sentencing memorandum, they had suggested a loss valuation of $1.75 million with no substantiating evidence, just statements. Obviously, again, Mr. Karadimos and I objected. The sentencing was scheduled for, I believe, 9, 930 in the morning. At 8.35 a.m., I received an e-mail from Mr. Nias, the assistant U.S. attorney, informing me for the first time that he would be calling telephonically a witness to testify on loss valuation. And this witness was going to testify from a report, a report that it turned out this witness had not actually on the case authored himself, but had been authored by another individual, a Mr. Wolfe. At the time of sentencing, we objected strenuously to, A, the late notice of the witness, and, B, the fact that I did not have a copy of this report on which the loss valuation was going to be presented. And the loss valuation was $127,000. I made several specific objections. I requested the report. I noted the language in Federal Rule of Criminal Procedure 32 stated provision of this report is mandatory upon a request. I asked to be given it. I went to we actually had a break over the noon hour for this sentencing because there was another large contested sentencing that day before Judge Hagerty. So over the noon hour, the government still did not provide me the report. I went through several inches of discovery. I came up with documents that I thought might be the report. Because the witness was testifying telephonically, I attempted to read to him documents I had to ask him if, in fact, this was the report on which he was relying. That was the point he was making. I am going to the reasons why this was a procedurally, that there was a violation of procedural due process and also substantive due process in the loss valuation of the $127,000 figure. The procedural due process was the failure to comply with the Federal Rule of Criminal Procedure 32 by incorporation of 26, requiring the government to provide me a copy of that report, speaking in the mandatory, saying shall. The substantive due process is this $127,000 figure was never accurately substantiated, particularly not under the clear and convincing evidence standard. The witness himself testified that the he did not do the work to come to this $127,000 figure. That's in the ER, the entire transcript at pages 41 and 42. He started the report, right? And then Wolf finished it. And then Wolf finished it. And particularly in doing this valuation, if you look at his testimony at pages 41 and 42, he stated he did not do the work to get to this $127,000 figure. So he was simply reading a document that I could not see. And apparently, this $127,000 figure was based solely on what were at that point in time apparently manufacturer-suggested retail prices. How would that affect the sentence? The sentence is, of course, based --"Judge Hagerty based it upon the guideline calculation." And he arrived at the loss valuation of $127,000, which, of course, substantially increased the sentencing guideline-suggested range. Beyond that, admitted and established by Mr. Karadimos. So how much would it increase? He got 18 months out of the possible, what, five years or something? Correct. But based upon his admissions, he was at a zero-to-six-month presumptive probationary range. If you steal a racehorse that's worth $100,000, you get to stay in jail longer than if you steal a pleasure horse that's only worth $100. You steal a horse thief, but you're still going to jail. Yes. It matters. Our guidelines and the way they are established, the valuation of loss for fraud cases, for copyright infringement cases, those are, in fact, the driving factor under the determination of what an appropriate sentence is. You're just running on and on and on. You know, you've only got ten minutes. You've got four minutes left. You know, you're arguing that the infringement amount was calculated incorrectly, right? Correct. Okay. And it should have been the amount was calculated by using the retail value of the infringed item, right? That's what the law requires, yes, Your Honor. That there must be clear and convincing ---- The law requires not the retail value, it's the retail price of the item and the market in which it is sold, not the retail price that the manufacturer or the copyright holder has placed on that item. Is that correct? That's right. Is that what you're arguing? That's right. Well, it should have been the retail value, what it was sold in the market. And then you put on evidence where, as I recall, you had some item that the retail price was $4,000, and you could buy it for, I think you said, 200 bucks in the marketplace. So that's what you're complaining about when it comes to this valuation. Am I right about that? That's part of the substantive due process. There's also the procedural due process element. I'm just asking you about calculations. Yes, Your Honor. Yeah. So and the amount that they came up with, what was that, $120-something thousand dollars, huh? If it had been $18,000, $7,000 less, then the range would have dropped from 12 to 18 months. Is that right? The only admission, Your Honor — I mean, I did these calculations. Did you do them? Yes, I did, Your Honor. And I believe they're in the Supplemental Excerpts of Records. I don't care where they are. The admission of $2,500 was only in the zero-to-six-month range, Your Honor, under the Guidelines. There was no — it was only the base offense level. There was no additional offense levels added for valuation because it was under $5,000. I would like to resume — What you're talking about when you cross-examine this expert, that was telephonically. Yes, and it was actually a lobbyist, Your Honor. And he admitted — he admitted that, yes, the item — the item, the suggested retail price from the Microsoft was, I think, as I recall, $4,000, and he also admitted you could buy it for $200. That was your cross-examination, wasn't it? He — I do not believe he actually made that admission. And, yes, Your Honor, I did — He — he — he — you want me to find it? Yes, Your Honor. If possible, perhaps we could go at those issues in rebuttal. I'd just like to reserve the last 45 seconds potentially for rebuttal. Okay. Thank you, Your Honors. All right. Counsel, Your Honors, Greg Niasse for the United States. Yes. Greg Niasse. Now, am I incorrect when I say the retail value should have been calculated using the retail price of the item in the market in which it is sold? That's a correct statement of the law, Your Honor. Correct statement of the law. And this item in the market in which it was sold was selling — there was some evidence here that it was — this particular item, which was priced, I believe, at $4,000, was There is evidence in the record — There is evidence in the record of that. Okay. Yes. However — I know. I'm not asking for the howevers. Okay. Okay.  The market in which it was sold should have been dated 2005 at the time of the infraction as charged, not as Ms. Maness suggested in 2009, which is what her sources were. Well, what was — what was it selling for in the market at the time you say it should have been selling for? For the manufacturer-suggested retail price. Why? Nobody pays the manufacturer-suggested price, do they? That was the best evidence the government had, Your Honor, to prove what a — what the market would support for the item at the time of the infraction. There's a lot of — a lot of things that you could buy right here in Portland over the Internet and have it shipped to your home somewhere else, and it's a lot cheaper than the manufacturer's-suggested price. Isn't that right? In 2005, Your Honor, the best evidence that the government had, and the most sound evidence that was presented to the Court, was the manufacturer-suggested retail price. In 2009, the price of the software, because it had been outdated, certainly would have fallen from, for example, $4,000 to $200. But the software, the product that would be purchased, as reflected by its value, would be useless. Well, when — when Manus counseled, cross-examined the expert and — on the telephone, what year were they in? Well, I'm sorry. What year were they talking about? Sentencing occurred in 2011. 2005 is the date of the allegation in the indictment, and that's the value that was taken from the BSA, Your Honor, 2004 to 2005. BSA. The Business Software Alliance, whose — I thought that was Boy Scouts of America. No, I'm sorry. It's the other BSA. I get misled all the time. I know. It's the only BSA I've known. And I never got beyond Tenderfoot, because I was a vegetarian and I wouldn't eat meat, and they discriminated against me. But the head of the Boy Scouts in L.A. said, anytime I want my second-class award, it's there for me. So we'll do it on the City Hall steps when I get back. I'm kidding you. Counsel, why was late notice given of the witness? Late notice was provided, Your Honor, principally because the government could not identify a witness. We called the BSA and could not find Mr. Wolf, the reason being he no longer worked there. Several entreaties to the BSA a week in advance left us with no messages, finally ended up with General Counsel's Office, who provided us with Mr. Schubert. As it turned out, Mr. Schubert notified us late Friday afternoon, early Monday, after we were able to review his testimony. We notified Ms. Maness when we knew we were going to call him. The plea and the sentencing happened at the same time, right? On the same day, anyway. On the same day. Was there any request by the defendant to continue the sentencing? None whatsoever. I was a little confused by part of the transcript where you indicated at one point that you didn't, or I'm not sure if it was you, but forgive me, but government counsel indicated that the report had been provided in discovery, and another place in the, and that's the Wolf report, and then another place in the discovery indicated that the report had come in only telephonically, and I think there's an indication, a statement by the government's counsel, that you didn't have the report. But there's other indications that later on that it's in the discovery, and, in fact, defense counsel reads from it after the break. So can you help me out? Was another copy of the report given to defense counsel prior to the break, or was it obtained from the stack of discovery originally given? I was government counsel. Thank you. So I'm going to clear that up. Okay. Our position is that the reports were all provided. Everything that the government had was provided in discovery 18 months prior to sentencing. So why did you say you didn't have it? Because I didn't have physically a copy isolated in my hand. I see. All right. So what was the, why is there an indication, a statement that it was a sort of a telephonic report? What did that mean? I'm not sure what the reference is to. Do you have a citation to that? I probably do. I don't want to take up your minutes. I'll look for it for you. Thank you. Are these microphones working up here? Are they? I think it's at 70. At GSER, SER, or? R0070. Is that the transcript number? Oh, you know what? That's, forgive me one moment. That's the witness. Is there a transcript page number? I'm working on it for you. Sorry. Go ahead with your presentation. I don't want to take your minutes. Thank you. I'll have it for you here in a second. I can't hear her. In summary, I guess, Your Honor, while I'm waiting for the question, is that this Court should affirm. Well, I want to ask you a few more questions. Sure. So we're agreed that the value is the retail price in the market in which the item is sold. And, I mean, we know that retail prices, whatever date we take, vary in that market. It's a hard question to answer yes or no. Why is it a hard question to answer? Because it assumes that the only valuation method is the reasonable price that's paid in the market. It says so. It says so right here. The infringement amount is calculated using the retail value of the infringed item multiplied by the number of infringing items. The retail value is the retail price of the item in the market in which it is sold. Okay? And here it was sold on the Internet. So let's go take the date. And the market values fluctuate. And, you know, here, if you cut back the actual retail value that we've been using, even $7,000, then his range would drop from 12 to 18 months. I disagree. Just cut it back $7,000. I disagree, Your Honor. As pointed out in the government's brief, Mr. Karadimos engaged in the sale of copyrighted material for over 5 to 7 years prior to involvement. You're talking about the computations in the probation report. Yes, absolutely. Today, probation officers, many of them are no longer social workers. They're like accountants. They go through the sentencing guidelines, which are unconstitutional, as you know. But unconstitutional material, we're told, is advisory. And so they go through these, and they make their calculations, sometimes in areas that are more complex than the Internal Revenue Code. So what was the sentencing range that we were using here? The sentencing range that the government advocated, Your Honor. Well, not that the government advocates, but the probation. Probation advocated a different range than the Court actually found. It was substantially higher than what the Court found. The government's range was highest, 1.75 million for the valuation. The probation officer found that there was still yet another theory of valuation. The Court found that the value was $175,000, $127,000. All right. So what range did the probation department find? Well, if I can point the government to the government's brief at pages 8 through 10. Tell me what price, what range the probation officer found. $975,000, Your Honors, what the probation found. And what did the judge use? The judge used $127,000. $127,000. And so if that $127,000 had been reduced so it was $120,000, we'd be in Zone C. I've got it right here. $12,000 to $18,000. Assuming two levels comes up, that is a correct calculation of the guidelines, Your Honor. And now this person, he committed no crimes of violence, did he? No, no crimes of violence. No crimes of violence. And he's, since these offenses were brought to the attention of the government and since the indictment, how long has it been? Seven years? Yes. Yeah. He's committed no offenses during that period of time? No, not that we're aware of. Not that you're aware of. I am out of time, so I just need to know. I need to note that I am out of time. What did you say? I am out of time, Your Honor. The red light's on. It's all right. I'm keeping the time right now. Okay. So don't, you don't have to feel guilty about that. I will set aside my feelings of guilt. Okay. And will the indictment charge him with $2,500? Actually, Your Honor, a closer reading of the indictment shows that he engaged in the production and distribution of copyrighted material in a value that exceeded $2,500. $2,500 is a jurisdictional amount that Congress implemented to prevent the government from going in and getting grandma from downloading the news. I'm sorry? Did he plead guilty to the indictment? Yes, he did. So he pled guilty to $2,500. No. He pled guilty to the sale of materials in excess of $2,500. Yes, $2,500. Over 18 months. Did that give you an open account to expand that excess to unlimited amounts? As Your Honor knows, the sentencing guidelines incorporate all the conduct which is relevant. And in this particular instance, that conduct began since the government began investigating him in 2004. But as Your Honor knows from reading the brief, Mr. Karadimus was engaged in the sale of this material since 2000. In fact, Mr. Karadimus admitted to the sale of these materials. He's not a nice man, but we don't care about that. That's not our problem. Sure. We have to decide whether this guideline sentence was within a reasonable scope of what's in the guidelines to the extent that they're not just advisory. Certainly. Counsel, just getting back to the other point. It's on excerpt. It's excerpt of record, page 30. Defense counsel says at line 19, I would like a copy of the report. The court asks you, do you have a copy? And your response was, and really this is just my only question, what did you mean when you said, Your Honor? We were never provided with a copy from the BSA. We were provided what we were provided with was a telephonic report of interview which was refurnished to Ms. Mannis in November of 2009. And then everybody seems to be talking from the report. I can tell that they're quoting it. So this passage didn't make sense to me. It's an incorrect statement. I'm glad I was wrong. Thank you for clearing that up. Would you repeat that? What was the incorrect statement? The statement referenced by Judge Kristen at page 30. It's at the excerpt at page 30? Yes. Which is the transcript at 24, I think. There was a question, Your Honor, as to the nature of the Wolfe report and whether the government had it or whether it provided it. Oh, I see. On the transcript, I made an incorrect statement of the fact and indicated that the government did not have it. Now, he doesn't really have a criminal history. He had a conviction in 1988 when he was 18 years old, and he got 18 days in jail. And we don't know what it's even for, do we? No, Your Honor. We have no idea. And so how do we find out about that? Probation. Probation found out? Well, they do a criminal history search for the defendant. What? The probation generally prepares the criminal history of the defendants in this district. In other words, did he come forth with this information? No. The probation department furnished that information to both— Yeah, but did he furnish that to the probation department? I don't know, Your Honor. You don't know that. So can't we—I mean, I'm assuming that if there's no record out there of it, that he had to tell—that he must have told the probation department that he had this problem when he was 18 years old. That's possible. That's— My experience has also shown that there are sometimes entries in criminal histories that have no specificity with respect to charge not lodged, sentence not lodged, disposition not found, things like that, if they're older, juvenile, or otherwise swollen. Well, anyway, anyway, he got 18 days when he was 18 years old, and he served 18 days. And it wasn't until—it was in 88. It wasn't until 2005 that the offense that we're considering his sentencing on, he was indicted on, 2005. That's correct. And seven years. And in the meantime, he became a father, and the mother who was living with him, she walked away from this, abandoned the family. She got some, as I recall, some trust funds, and the defendant here has been taking care of his daughter, been taking good care of her. He's back in Maryland, living at his mother's house. The grandfather, who was the father of the mother who abandoned the daughter, he's a lawyer in Maryland, and he talks to the probation office about what a fine father this defendant is. So what do we have to gain by taking him away from his daughter, putting him in prison for 18 months? What do I need? I'm sorry. I don't understand. What does society have to gain? The 3553a factors, Your Honor. Yeah. The 3553a factors specifically address deterrence and enforcement of the law, punishment for the offense. And in this particular instance, Mr. — Yeah, but they're discretionary. Absolutely. Absolutely. See, you're used to this new system that we have. It's new because it's been in effect for almost 30 years. But when I was sentencing, we had the other system where the judge decided what the sentence was. Not the prosecutor. Believe me, I make no decision as to what the sentences are. As you can tell, Judge Heider, you did not follow the government's recommendation. Yeah, well, that's a good thing. Otherwise, we now have 1% of our population in prison. Put this man in prison for 18 months. Probably cost the government $80,000, huh? I'm unaware of how much — what the cost is. Well, it costs $50,000. It costs more money to put someone in prison than to send them to Harvard. You don't know that? I'm unaware of that statistic. Well, you've got to keep up reading, you know, to find out what's going on. Anyway, I'm just reciting this because I think in all the circumstances, an 18-month prison sentence here is excessive. And I think it would disrupt this child's life. And, I mean, did anyone suffer any real economic loss here? There is no documentable specific economic loss. No document of any specific economic loss. It's difficult for the government to point to sales of Microsoft's software by Mr. Karadimos and say that that is a substituted sale that Microsoft would have otherwise received the benefit of. We did not go out and interview the people who purchased software from Mr. Karadimos, who we anticipate would — or we don't know whether they would have said, I would have gone to Home Depot and bought — or House Office Depot and bought Microsoft Word, but I saw Mr. Karadimos had it for a fraction of the cost, so I bought it there. It's the BSA people who push this. No, Your Honor. Actually, Mr. Karadimos was discovered independently with — by the FBI. An informant informed the FBI office in Los Angeles that Mr. Karadimos was engaged in copyright violations. The FBI works with the Boy Scouts of America. Well, I'm sure many of them were Boy Scouts. Yeah. We'd like to think that they are, but they're not. In any event, the FBI independently found Mr. Karadimos. At the same time, Mr. Wolf provided his report to the FBI. Okay. Unless Your Honors have further questions, thank you. Thank you. Counsel, I have a couple of questions for you. Thank you. It seems to me that the district court judge used 131 titles out of a catalog that was about 1,900 titles. Is that right? Your Honor, I honestly don't know what Judge Hagerty utilized. I know that there was a variety of testimony and — That's what the report shows. The record shows that pretty clearly, that he looked at BSA's inventory. BSA only valued the ones that were represented by their clients. Right. And you've clearly voiced your objection or concern about the government relying on Business Software Alliance. But I think the record's pretty clear that Business Software Alliance had — its members had 131 of these titles, and that's what the judge used. Right. And he assumed one sale of each of those 131 titles. That's what the BSA lobbyist testified. Yes, Your Honor. And that's how the judge calculated his number, isn't it? The judge adopted that testimony. And that's how we get to $127,000. Correct, Your Honor. But the government got to $1.75 million, and the pre-sentence report recommended $975,000. Yes, Your Honor. And as we noted in our objection letter to the pre-sentence report, it was based upon an estimated sale, which under the United States v. Kennedy decision was totally speculative.  But the judge didn't use that. The district court judge. So before I find fault with the district court judge's calculation, I'm looking at the evidence that the district court judge had available. And there's the BSA number, which is 131 of their titles, at the manufacturer's suggested resale price, right? And my concern is — and really, this is my question — did the judge have any other information, any other evidence about what these titles might have been available for six years earlier at the time of the offense? Not that I'm aware of, Your Honor. And I would like to address whether the judge actually had this evidence available. The government has informed you that this report was provided in discovery. Yes. I, to this date, have never heard from the government. Please look at Karadimos Fates Stamp pages A, B, C, D. That is where the report is. I cannot find this report. I do not see it. If you look at my AOB at pages 7 through 9, where I am quoting the excerpts of records, pages 31 and page 41, I made repeated efforts to say, I'm looking at a document that says this across the top. Is that the report you were reading? And he said no. Right. He was reading from his report, and he didn't have the Wolfe report, but you did. Right? I still, to this day, do not know which report. I have not seen it. I have looked through the discovery. I asked for Bates numbers. Nowhere in the briefing at this point in time have I seen the Bates numbers of what this report was provided in discovery. I received several inches of discovery, a lot of discovery. So what I did, and you asked about a continuance. We had an hour and a half, almost two-hour break. The government could have obtained this report and sent it to me. My client came 3,000 miles from Maryland for a plea and sentencing that had been set three months before. If the government had wanted to provide this report to me, there was more than sufficient time to do so. I took that time, went to the discovery, found the best thing that I could that looked most like what they were describing, and I was wrong. So when we say that there was evidence, the fact is Mr. Schubert's report was not provided to the Court. It was requested. It is mandatory under Federal Rule of Civil Procedure 32 and 26. Without that report, there was no evidence, period. Because Mr. Schubert himself said he did not do the work to get to the $127,000 figure. Mr. Wolf did. Kagan. He started the report but didn't finish it. Right. And Mr. Wolf, and if you look specifically at — I'm sorry. I left my notes over there. But there was this — I can send it to you in a letter. I asked him, I believe it was around Excerpts of Record 41. Did you do this work? He said no. That was not his figure. Judge Pragerson, yes. Mr. Carradine. Do you have the paper over here? I do have it right over here. If you can — Why don't you just grab it? It is at Excerpts of Record pages 41 and 42. I specifically asked him. And, Judge Pragerson, yes, Mr. Carradine was interviewed with the presentence report writer. He talked about his youthful indiscretion. It was with a cousin when he was at the age of 18. I honestly do not know if the probation officer was able to find other records regarding that conviction from other sources in Maryland. But Mr. Carradine was very forthcoming with the probation officer about that — that youthful part of his life, which was — it's a couple of decades old now, and he very much regretted it, as he very much regretted his behavior here. If there are no further questions, Your Honor, thank you very much. You found the documents that you were referring to. Yes, Your Honor. And I provided Judge Christian the citation in the record. Thank you, Your Honors. All right. Thank you.  All right. Now we can go to the next panel.
judges: Goodwin, Pregerson, Christen